OF

# THE DECISIONS

OF THE

# SUPREME COURT OF ALABAMA.

## JANUARY TERM, 1833.

---

### HALLET *versus* THE HEIRS OF ESLAVA.

1. The copy of a foreign grant, (or of a conveyance under it,) made from the Land office Register, or original entries, thereof, cannot be substituted, in evidence, for the originals, until the latter have been shown to be lost or destroyed.

2. Where the title to real estate is defended on a *grant*, issued by a foreign power; such grant must be produced, or its loss or destruction legally shewn, by a full and entire transcript from the record, before it becomes evidence.

3. A foreign grant to real estate, before it can preponderate against a patent certificate, issued under the authority of the United States, must be produced, (in order to test its validity,) or its absence accounted for, and supplied, according to the rules of evidence.

4. Where it appeared, that two certificates of confirmation, for a certain lot of land, had issued in favor of different persons, (under the acts of Congress, confirming claims to lots in the town of Mobile) which, alone considered, created title of equal grade; held, that the elder was entitled to preference, as evidence of title, unless it could be shewn, that it had been improperly issued.

5. In cases, where two certificates of confirmation, issued under such acts of Congress, come in conflict, and balance each other, it is competent for the courts to look to the original evidence of title, beyond such certificates, and to determine independently of them.

vol. 3.                                    14

6. And where a certificate of confirmation, in favor of one, had issued on a claim, under a French patent, which was not produced, nor its absence accounted for, and which did not appear to have been recorded, as required by law; held, that possession of the premises, by the ancestor of the opposing party, under a claim of right for twenty-four years, anterior to the possession of his adversary; in the absence of any preponderating paper title, was sufficent to warrant a recovery in the action of trespass to try title.

The plaintiffs below, the heirs of Eslava, declared in Mobile Circuit court, against Hallet, in the action of trespass to try title. The subject in controversy was a lot of land, lying in the town of Mobile.— Both the parties claimed, under certificates of confirmation, issued by the Land Office, under the act of the Congress of the United States, confirming claims to lots, in the town of Mobile.

The evidence of title, produced in support of the plaintiffs' claim, and right of recovery, were—a certificate of confirmation, dated the third of September 1824, issued by the Register of the Land Office under the act of Congress, of 1822; and the claim upon which the same was founded, consisting of a conveyance from Don Joaquin De Osorno, of the lot in question, to Don Miguel Eslava, the plaintiff's ancestor; and a notice of claim: also, a warrant of location for the lot in question, issued from the Land Office; and a conveyance, copied and translated from the Spanish records, and which purported to have been a sale or grant from Francisco Fontanella, of the same lot of land to Osorno, the grantor of Eslava: also, the evidence of a possession in the plaintiff's ancestor, of the premises, of twenty-four years, anterior to that of the defendant.

The defendant relied on a certificate of confirma-

tion, dated 28th March, 1827, issued under the same act of Congress, from the Land Office, in favor of the heirs of Farmer, under whom he claimed, founded on a French grant, or patent, to one Grondell, copied from the Land office *"Register of Evidence,"* and which was merely a statement or table, of the names of the claimant, and of the grantee; the date of the grant, and the description of the lot; but which did not show any evidence of the original grant in full, nor describe its import at length. The defendant objected to the introduction of the copy of the conveyance, from Fontanella to Osorno, as evidence, as it did not appear to have passed through the land office, or been filed or recorded there; but the court below overruled the objection, and the said copy was admitted as evidence. The defendant asked the court to charge the jury, that the evidence of title, produced by him, was paramount to that offered on the part of the plaintiffs: and he was therefore entitled to a verdict.—But the court refused so to charge; and instructed the jury that the certificates of confirmation, in the possession of the plaintiffs and defendant, balanced each other—and that the proof of possession, by the plaintiffs was sufficient to authorise a recovery. Verdict and judgment having been rendered in favor of the plaintiffs, the defendant, by bill of exceptions, brought the case here.

*Hitchcock* and *Acre*, for plaintiff:
*Elliott* and *Hale, contra*

SAFFOLD, J.—This was an action of trespass, to recover damages, as well as to try titles to a lot, in the city of Mobile, bounded by the lot called the *"Cot-*

*ton press lot,"* occupied by A. F. Stone & Co. on the East; Government Street, on the South, and on the North, by the public bake-house lot.

The defendants in error were plaintiffs in the Circuit court: they obtained a verdict and judgment for the premises in dispute, and for the damages sustained. On the trial, Hallet, the then defendant, excepted to the opinion of the court, as follows, viz:— "The plaintiffs proved possession in their ancestor, of the premises, in the declaration mentioned, from about the year 1802, until the day the defendant was put in possession by the sheriff of Mobile county, of the premises, which was proved to be the day of the commencement of the suit (the 4th April, 1826;) and also gave in evidence a certificate of confirmation, from the land office of the proper district; together with their notice of claim, and the bill of sale, whereon the said claim was founded, hereto annexed, (marked A,A,) also a warrant of location, from the same land office, with a bill of sale attached, translated and copied from the Spanish records; but which bill of sale had not passed through the land office, nor been filed or recorded there; and which was objected to being received as evidence, on that account; but the objection was overruled, and the said bill of sale was permitted by the court, to be read in evidence, and which bill of sale is hereto annexed, (marked B,) with the before mentioned order of location, hereto attached, (marked G,) and also a patent certificate, hereto annexed, issued from the same land office, (marked E,) and there rested their case.

The defendant gave in evidence a patent certificate of confirmation, issued from the same land office, in the name, and in favor of the heirs of Ro-

bert Farmer, under whom he claimed, (marked C,) for the same premises mentioned in the plaintiffs' declaration, founded on a French patent, or complete grant, to one Grondell, under whom said heirs claimed, bearing date the 19th April 1757, as appears, by the "Register of evidence, collected, in relation to lots in the town of Mobile," hereto annexed, (marked D,) and which was also given in evidence, having been copied from the records of said land office, and proven to be a true copy." But, it is also stated in the exceptions, that the only evidence offered by the defendant, of his claim, having been derived from a French grant, to Grondell; or that there had been a grant to him—was the evidence taken from the land office, and before referred to," &c. "And it was further in proof, on behalf of the plaintiffs, that Cayeton Perez, who succeeded Osorno, as Spanish commandant, occupied a house on the premises, previous to the change of government, and paid rent to the plaintiffs' ancestor for the same."

The defendant having, also, rested his case on the evidence stated, prayed the court to charge the jury, that the evidence so offered, on his part, was paramount to the evidence of title, offered by the plaintiffs; and, that, therefore, they ought to find for him: but the court refused so to charge them; and, on the contrary thereof, did charge them, that the one certificate balanced the other; and, that the evidence of possession, on the part of the plaintiff, was sufficient to entitle him to recover; and, that they ought, under the evidence, to find for the plaintiffs.

The certificate of confirmation, referred to, under letter A, is from the Register and Receiver, acting, *ex-officio*, as commissioners; and states, that claim, No.

79, in the Report of the Commissioners, No. 11, claimed by Miguel Eslava—original claimant, J. De Osorno—was confirmed ; it being for a lot, containing ——, situated in the town of Mobile ; and claimed under a grant, lost, by time or accident; and to be located, &c. ; and was expressed to have been granted in pursuance of an act of Congress, passed the 8th May, 1822, entitled, "An act, confirming claims to lots in the town of Mobile," and bears date the 4th November, 1822. This is understood to be the lot in contest.

The information of claim from Eslava, also marked A, consisted of a notice to the commissioner of his claim, to a lot and house, by virtue of a bill of sale to him, from Joaquin De Osorno, commandant, &c. of Mobile, bearing date, in 1814; accompanied with a conveyance from Joaquin De Osorno, commandant of Mobile, to Eslava, declaring a sale of the house, in which it is recited, the former had dwelt upon the lot of ground he bought of F. Fontanella, and built, at his own expense; and which he ceded to Eslava, free from all incumbrance, &c. This notice is certified by W. Barton, as Register of the land office, to be a true copy from the original record of the claim of Miguel Eslava, from the written evidence of claim then in his office; and that a certificate of confirmation, to wit : certificate No. 74, of claim, No. 79 in Report, No. 11, of the commissioner, had been issued by the register and receiver, in his favor, and bears date 4th November, 1822.

The paper referred to in the exceptions, as the bill of sale, (B,) purports to be a conveyance from F. Fontanella, to said Osorno, of a lot of 114 feet front, and 226 in depth, bounded, north, from the king's

bake-house, &c. translated and copied from the Spanish records, bearing date, August, 1801; and which, as stated in the exceptions, was translated and copied, as aforesaid, but does not appear to have passed through the land office, nor to have been filed or recorded there : it has attached to it the warrant of location, as described in the exceptions, for the same lot, dated, August, 1823 ; together with a duly certified plat, stating the lot to contain 25,312 superficial feet, dated 29th October, 1823.

The patent certificate in favor of Eslava, also referred to, is in the usual form for the same lot, of the same contents, from the same land office, bearing date 3d September, 1824.

The patent certificate C, offered in evidence on the part of the defendant, is from the same land office, and purports to have issued, in pursuance of the act of Congress, also of the 8th May, 1822, entitled; "an act confirming claims to lots in the town of Mobile, and to lands in the former province of West Florida, which claims have been reported favorably on, by the commissioners appointed by the United States." It certifies that the claim of the heirs of Robert Farmer, original claimant Grondell, No. 27, in the report of the register and receiver, No. 7, had been confirmed, under the said act, and that on the 8th May, 1824, the said claim was regularly surveyed, containing 12,600 superficial feet, &c., and designated as a lot in the town of Mobile, in township No. 4, of range No. 1, west, bounded and described as per plat, &c. and bears date the 28th March, 1827. The certificate of survey accompanying the plat, states, "It may be proper to observe, that a claim is set

up for the same lot, by the representatives of Don Miguel Eslava, by purchase from Osorno."

The evidence referred to, under letter D, in the exceptions, to shew that the certificate in favor of the heirs of Farmer, was founded on a French grant, to Grondell, is found to be only an abstract of claims, being a copy of the report of the commissioners as recorded in the land office, entitled a "Register of evidence collected in relation to lots in the town of Mobile," shewing in a tabular form only, the number of the lot—by whom claimed—the original claimant—the nature of the claim, and from what authority derived—date of the claim—quantity in feet—where situated—to whom issued—cultivation and inhabitation.　To which is subjoined the certificate of the register, that the same is a true copy of the report of the commissioners, on the claim of Robert Farmer, as recorded in the book destined for that purpose, in his custody.　These are all the facts considered material : the identity of the lot is not contested.

Hallet, the plaintiff in error, now assigns as erroneous the several matters and opinions of the court, as stated in the bill of exceptions.

If the case be viewed, with reference alone to the presumption of right, arising from possession, the advantage is obviously in favor of the heirs of Eslava. Notwithstanding Hallet was in quiet possession, at the commencement of this suit, and appears to have been placed there by the sheriff, the former have proven a possession, by their ancestor of about twenty-four years prior to that time.　No legal inference can be drawn as to the strength of Hallet's title, from the fact of his having thus quietly obtained posses-

sion, farther, than that he did not enter as a trespasser. If he had previously established a right, either of property or possession, which continued available, by any judicial determination, it was his privilege and duty, in this trial, to have availed himself of it, either by the record, or by the introduction of the same evidence, *de novo*.

But the plaintiff in error, now relies upon the patent certificate, in favor of the heirs of Farmer, founded on the French grant to Grondell, under the former of whom he assumes to claim title. He insists that his *title*, as it was derived from a grant, complete, and of early date, can not be overreached; or that if he has not shewn a regular deduction of the title to himself from Grondell, that he has proven an outstanding title in another, which is sufficient for his defence. It is admitted to be a well established rule of law; that to entitle a plaintiff in ejectment to recover, he must show a sufficient title in himself, regardless of the weakness of his adversary's. If the defence can prevail, it must be alone on that principle; for the position assumed in argument, that neither the French grant, nor any competent evidence of it, appears from the record to have been produced on the trial, is equally sustainable. If an inference could be drawn from the first part of the bill of exceptions, that it was produced, the subsequent statement, that " the only evidence offered by the defendant, of *his claim*, having been derived from a *French grant to Grondell, or that there had been a grant to Grondell*, was the evidence taken from the land office, and before referred to, under the letter D," excludes the idea of any other proof of its existence, legality, or genuineness; or that there was any proof of a chain of title from the

vol. 3.                    15

patentee to Hallet. I recognise no authority for adjudging a copy of the land office register, or the original entries of the grant to Grondell, or of the conveyance from him to Farmer, as legal substitutes for the originals in either case, until, at least, the original instruments have been shown to be lost or destroyed.

Various acts of Congress have been referred to in argument, on both sides, as being material. Legislation relative to titles to lands in West Florida, and lots in Mobile, has been so frequent, as greatly to embarrass the subject, and create difficulty in extracting such parts of them, only, as are material to the questions presented.

The first which I consider necessary to be noticed, is that of 25th April, 1812, for ascertaining the titles and claims to lands in that part of Louisiana which lies east of the river Mississippi and island of New Orleans." It creates two land districts, one east and the other west of Pearl River; and authorises the appointment of a commissionor and clerk to each, for the purposes of the act. By the fourth section, it requires, "that every person claiming lands in the tract of country aforesaid, by virtue of any grant, order of survey, or other evidence of claim whatever, derived from the French, British, or Spanish governments, shall deliver to the commissioners of land claims," &c. a notice, in writing, stating the nature and extent of his claim; together with a plat, (in case a survey shall have been made,) of the tract or tracts claimed; and shall deliver to the commissioners, when attending as aforesaid, for the purpose of being recorded, every grant, order of survey, deed, conveyance, or other written evidence of his claim, and the same shall be recorded by the clerk, in a

book to be kept for that purpose: *Provided*, that, where lands are claimed by virtue of a complete French, British, or Spanish *grant*, it shall not be necessary for the claimant to have any *other evidence* of his claim *entered at large*, on the record, except the *original grant* or *patent*, together with the *order of survey and the plat*; all *the other* conveyances, or deeds, may be *abreviated in the entry*, but the chain of title and the date of every transfer shall appear on the record. And if such purchaser shall neglect to deliver such notice in writing, of his claim, together with the plat, (in case the land shall have been surveyed,) as aforesaid, or cause to be recorded, such written evidence of the same, within the time and times as aforesaid, his claim shall never afterwards be recognized, or confirmed, by the United States; nor shall any grant, or order of survey, deed, conveyance, or other written evidence, which shall not be recorded *as above directed*, ever after, be considered, or admitted, as evidence, in any court in the United States, against any grant which may hereafter be derived from the United States."

The seventh section, directs the commissioners, under instructions from the Treasury Department, "to prepare, or cause to be prepared, *abstracts* from the records, of the claims filed as aforesaid," which "abstracts shall contain the substance of the evidence adduced in support of, or obtained respecting the claims; and shall contain such other information and remarks, as may be necessary to a proper decision thereon; which abstracts the commissioners shall respectively, as soon as may be, report to the Secretary of the Treasury, and shall be by him laid before Congress, for their determination thereon."

An act entitled, "an act for adjusting claims to lands, an destablishing land offices in the district east of the island of Orleans," passed on the 3d March, 1819, created the land offices at St. Helena C. H. and at Jackson C. H., and authorised the appointment of registers and receivers thereof; and transferred to them the powers and duties previously confided to the commissioners of the districts east and west of Pearl river. It also directed the appointment of a principal deputy surveyor for the lands within the said districts; and contains various other provisions, similar, (as far as material to this case,) to the directions of the other act already quoted.

The act of 8th May, 1822, "supplementary to the several acts for adjusting the claims to lands, and establishing land offices in the districts east of the island of New Orleans,"[b] section one, provides that all claims to lands said to be derived from the British or Spanish authorities, reported to the commissioner of the general land office, by the registers and receivers, (who, as we have seen, were authorised to exercise the powers and duties originally vested in the commissioners,) which should be contained in their several reports, "and which are, in the opinion of the registers and receivers, valid, agreeably to the laws, usages and customs of the said governments, be and the same are hereby, recognized as valid and complete titles against any claim on the part of the United States, or right derived from the United States."

The second section contains a similar provision, respecting all claims reported as aforesaid, "founded on orders of survey, requettes, permissions to settle, and other written evidences of claim derived from

the Spanish authorities, which ought, in the opinion of the registers and receivers, to be confirmed:" *Provided*, that all such confirmations of claims, "shall amount only to a relinquishment forever, on the part of the United States, of any claim whatever, to the tract of land so confirmed or granted." The fifth section of the same act directs the issuance of patents for all lands, the claims to which should be confirmed, by virtue of the provisions therein contained, in the same manner that patents are granted for lands confirmed under former acts, to which this is a supplement.

Another act of the same date, (8th May, 1822,) "confirming claims to lots in the town of Mobile, and to lands in the former province of West Florida," &c. ᵃL. L. 819 provides : "Section 1, that all claims to lots, in the town of Mobile, founded on complete grants, derived from either the French, British or Spanish authorities, reported to the Secretary of the Treasury by the commissioner east of Pearl river, under the first recited act ; or which were so reported by the register and receiver, acting as commissioners under the act of the third March, 1819, before recited, and which are, in his opinion, valid, shall be, and the same are, thereby recognized *as valid.* The second section contains a similar provision respecting all claims to lots in Mobile, founded on any orders of survey, requettes, permissions to settle, or other evidences of claim, derived from either of said authorities, and bearing date prior to the 20th December, 1803. The third section places all claims to lots on the same valid footing, which have been reported in the same manner, "founded on private conveyances, which have passed through the office of the commandant, or

other evidence, but founded, as the claimants allege; on grants lost by time and accident; and which ought, in the opinion of the commissioner, to be confirmed.

Thus, it appears, that, by the fourth section of the act of 1812, the evidence of the various grades and descriptions of land titles, were required to be delivered by the claimants, to the commissioners of the respective land districts, east and west of Pearl river, for the purpose of being recorded ; and the same was directed to be done accordingly. That, where the claim was by virtue of a French, British or Spanish grant, the same should "be entered at large on the record ;" together with the order of survey, and plat, if surveyed; and that all the other conveyances, or deeds, might be *abreviated in the entry:* and further, it was provided, that if any such claimant should neglect to cause to have recorded, such written evidence of his claim, the same should never afterwards be recognised or confirmed by the United States— nor should such be considered, or admitted as evidence, in any court of the United States, against any grant, issued under the authority of the same. And, that the *abstracts* from the records of the claims filed, with the accompanying remarks of the commissioners, as directed by the seventh section of the same act, to be reported to the secretary of the treasury, should be, by him, laid before congress, for their decision thereon.

· It was, doubtless, to avoid the labor and expense of transcribing the evidence entire; and from a presumption, that *abstracts* would answer all the purposes of transcripts or originals, for the summary and *ex parte* investigations by congress ; and a conviction that any one, who chose to do so, would have an op-

portunity of contesting the legality of all such titles, before a judicial tribunal, on the highest and best evidence the nature of the case would admit of, that full transcripts were not required at the treasury department. But, it was deemed no less necessary, that the best evidence should be delivered to the commissioners, and be, by them recorded, for their better preservation; and for the information of all persons, who then were or might, afterwards, become interested therein. The original paper titles are presumed still to have remained subject to the use of the claimants.

It has, also, been shewn, that the act of the 3rd March, 1819, above referred to, besides establishing the land offices, and vesting the powers and duties previously belonging to the commissioners, in the registers and receivers, required, that the evidences of land claims, not previously attended to, should be delivered to them, to be recorded, and reported on, in the manner required of the commissioners, in the former act.

It further appears, that the act referred to, of the 8th May, 1822, "confirming claims to lots, in the town of Mobile," &c. recognises all proceedings legally had, under the former acts, and declares valid, all claims to town lots, founded on complete grants; or, on any orders of survey, requettes, permissions to settle, or other evidences of claim, existing prior to the 20th December, 1803; and, which claims, of either kind, were derived from the French, British, or Spanish authorities: also, all claims to lots, founded on private conveyances, which were passed through the office of the commandant, or other evidence, supposed to be founded on grants, lost, by time

and accident; provided, in each case, that the claims have been reported as required by the acts, and are valid, in the opinion of the commissioners, making the reports thereon. Nothing is found, in any subsequent act, varying the provision of the act of 1812, that the evidence, in all cases, not laid before the commissioners, and recorded, as directed, shall be inadmissible, as evidence, in courts of justice, against .any *grant* from the United States.

If, then, the " register of evidence, collected in relation to lots in the town of Mobile," relied on, by the plaintiff in error, was inadmissible as evidence of a legal title, it could only serve to prove a colorable title, in the heirs of Farmer, and create the presumption, in the absence of higher evidence, that their patent certificate issued on that grade of title only. It is entirely clear, that this evidence cannot have the effect to prove, that the alleged French patent was a valid and subsisting grant. The patent, itself should have been produced, or its loss or destruction legally shewn; and then a full transcript from the record, not the mere abstract, should have been produced in evidence : and, in either case, the genuineness and legality of the patent, should have been shewn, according to the rules of evidence.— This grade of evidence must be presumed to exist, and to be within the power of the party, as the report of the commissioners purports to have been founded upon it, and the law required, that it should previously have been recorded *at large.*

The case of *De La Croix* vs. *Chamberlain,*[a] furnishes authority, by analogy, for requiring proof of the existence and legality of the supposed French grant. In that case the Supreme court says, the

warrant of survey relied on, "does not appear to
have been recorded; it purports to be the act of
foreign officers, and was not verified by the great seal
of the nation to which they belonged, or any other
authoritative official seal, which was known or could
be proved. The court and jury could not be presum-
ed cognizant of their signatures. How then could
the genuineness and authenticity of the document be
proved, otherwise than by proof of the signatures of
the officers by whom it purported to be made? It
was not of that class of public instruments which
prove themselves, and consequently ought to have
been proved in the mode ordinary instruments are
required to be verified by the rules of evidence."—
In this case, then, the French patent ought to have
been produced, that it might have appeared whether
it had been authenticated by any "authoritative offi-
cial seal," which proves itself, or could be proved;
or its absence should have been accounted for and
supplied, according to the rules of evidence, before
it was entitled to the weight of a grant, or could pre-
ponderate against a patent certificate, under the autho-
rity of the United States. As evidence of a colorable ti-
tle, alone, it is worthy of less consideration than it might
otherwise have been, from the fact, that no connec-
tion of title is shewn between the plaintiff in error,
and Grondell, the supposed grantee.

In the case of *Jackson* vs. *Hudson*, it is said, "If [a3 John.R. 381]
a defendant sets up an out-standing title, existing
in a stranger, it must be a present subsisting title:
it must be one that is living and operative — other-
wise the presumption will be, that it has become ex-[b3 Wheat. 212, notes]
tinguished."[b]

Some of the preceding remarks and authorities, tend, also to shew the invalidity of the paper, entitled, the bill of sale, marked B, from Fontanella to Osorno, under whom Eslava's claim purports to have been derived, the admissibility of which, as evidence, was objected to. It does not appear to have been delivered into the land office, and recorded, by abreviation, as directed by the act of 1812. Though the government of the United States does not appear to have issued any patent for this land, which, according to the literal expression of the act, would exclude the neglected evidence : yet, I consider the reason of the exclusion not entirely inapplicable to rights of inferior grade—such as certificates, which, by law, entitle the holders to patents. This bill of sale, however, appears to have been introduced, rather in aid of Eslava's certificate, than against Farmer's ; and, was material, to shew that the prior possession of the former, on which his heirs mainly rely, was continued under a claim, or assertion of right. In this view, there was no error, in admitting the evidence.

Yet, I maintain, that it was competent, according to national law, for congress to require the production of all land titles, in the tract of country lately ceded to the United States : and a record of them—as the only means of retaining their validity. Otherwise, it would have been impossible to ascertain the state and condition of the various grades of conflicting titles, and separate the private claims from the public domain. It is admitted, that according to modern principles of justice and humanity, even the conquest of a nation, does not, as formerly, extinguish the titles of individuals to their lands : " that

it is against one sovereign, that another makes war, and not against the quiet subjects."—That, "the conqueror lays his hands on the possessions of the State, on what belongs to the public, while private persons were permitted to retain theirs."[a]  When the sovereignty is changed, by a treaty of cession, the rights of individuals ought to be, and usually are respected, in like manner.  Yet, says the same author, "every State has the liberty of granting, or refusing, foreigners the power of possessing lands or other immovable goods, within its territory.  If it grants them these privileges, these kinds of possessions, belonging to foreigners, remain subject to the jurisdiction and the laws of the country; and to the same taxes as the rest.  The government of the sovereign extends over the whole territory; and, it would be absurd, to except some parts from it, on account of their being possessed by foreigners."[b]  Again, he says, "Immovable possessions, lands, towns, provinces, &c. become the property of the enemy, who makes himself master of them: but, it is only by treaty of peace, or the entire submission or extinction of the State, to which these towns and provinces belonged, that the acquisition is completed, and the property becomes stable and perfect."[c]  That, "the necessity of making peace authorises the soveregn to dispose of the property of individuals; and the eminent domain gives him the right to do so."[d]

These reflections and quotations have been elicited by the parts of the argument, which related to the power of the different governments to recognise or reject the different grades of title, in controversy.— But, as the alleged French grant, to Grondell, does not appear ever to have been recognised, under the

[a] Vattel, B. 3, ch. 13, § 200.

[b] Vat. B. 2, ch. 8, § 114

[c] Vat. B. 3, ch. 13, § 197

[d] Vat. B. 4, ch. 2, § 12.

Spanish government, and was not produced on this trial, it is unnecessary to investigate, particularly, the obligations of the United States government, to respect claims to lands, derived from the French, or British governments. But, it is worthy of notice, that, by the treaty of Ildefonso, in 1783, between Great Britain and Spain, in reference to Florida, eighteen months, only, were allowed to the subjects of the former, "to sell their estates, and remove their effects, as well as their persons;" but, with the farther stipulation, that if, from the value of the possessions of the English proprietors, they should not be able to dispose of them, within said term, then the Spanish sovereign should grant them a prolongation, proportioned to that end.—Pursuant to which, a prolongation of four months was given.ᵃ

ᵃ*Vide*Land L. 990-1.

The construction of that treaty seems to be, that all British claimants were entitled to this indulgence; not only British inhabitants, but those who may have been subjects of the king of Great Britain, in the said provinces: but, in order to receive it, they must have complied with the terms of the treaty; and, if they failed or neglected to do so, and cause their titles to be recognised by the Spanish government, it was their own neglect or misfortune, and they must abide the forfeiture. If the terms of the treaty were violated by Spain—(but which does not appear, and is not to be presumed)—it furnished a subject of complaint and negotiation between those governments: it involved, not a judicial, but a political question—with which the United States have no concern, as they were neither parties nor privies to the war or treaty.

If, therefore, the patent to Grondell, from the French government, (which could not be better than if from

the British government,) ever had validity, it is pre-
sumed to have been forfeited, under the British or
Spanish governments, while they successively exer-
cised the sovereignty of the country ; so that, at
most, it rested in the discretion of this government,
to recognise it or not; and on such terms, as res-
pects the time and manner of exhibiting the evidence,
as it might deem necessary to prescribe.—See *White
& Overton's Report on British Claims.*[a]        [a]L. L. 962, 965

Admitting also, that the conveyance called a bill
of sale to Osorno, for the causes mentioned, could
only be regarded as part of Eslava's evidence of co-
lorable title, in connection with his possession, yet
his notice of claim, his warrant of location, his cer-
tificate of confirmation, and subsequent patent certi-
ficate, shew, that the validity of his title, was recog-
nised by the government, pursuant to the act of 8th
May, 1822, "confirming claims to lots in the town
of Mobile," &c.

But it is contended, in opposition to this evidence
of right, that the heirs of Farmer also, have obtain-
ed a patent certificate from the government, in like
manner, on evidence satisfactory to the officers en-
trusted with this duty : and, that Hallet, being defen-
dant in the suit, must be considered secure, unless
the plaintiff can produce a perfect indefeasable title—
that a plaintiff in ejectment, can only recover on the
strength of his own title—not on the weakness of his
adversary's. It is, however, to be recollected, that
the warrant of survey, and certificate, in the name
of the heirs of Farmer, are junior to those in favor
of Eslava ; and that the former certificate is admit-
ted to have been founded, alone, on the supposed
French patent, which does not appear to have been

recorded, as required by law; and of the existence of which, the Circuit court had no legal and sufficient evidence. In this aspect of the case, alone, independently of the main reliance of the heirs of Eslava, (which is his prior possession of more than twenty years,) their right would appear superior, according to the rule which prefers the oldest deed.— A statute of this State, passed under the territorial government, in 1812, would, also, be material, in this view of the case.—It declares, " that all certificates, issued in pursuance of any act of congress, by any of the boards of commissioners, register of the land office, or any other person, duly authorised to issue such certificate, upon any warrant or order of survey," &c. " for any land in this territory, shall be taken and received, as vesting a full, complete, and legal title in the person, in whose favor the said certificate is granted, to the lands therein mentioned, and his, her, or their assigns, so far as to enable the holder of such certificate to maintain any action thereon; and the same shall be received in evidence, as such, in any court of this territory."[a] Notwithstanding each party relies on a certificate, which, abstractly considered, creates title of equal grade, when they come in conflict, as in this case, the general rule would give the preference to the elder, unless it could be invalidated, by shewing that it had illegally issued.

As respects the objection, that the claim of Eslava was originally for a lot of indefinite contents, it is sufficient to say, it has subsequently been ascertained, by a regular survey, made pursuant to the act of Congress of 1819; and the same objection applies, with with equal or greater force, to the claim of the heirs of

[a] Digest 248

Farmer.   The location of the latter, as respects the French grant, and the occupancy by R. Farmer, is also indefinite, except as shown by the "Register of Evidence, in relation to lots in the town of Mobile," previously noticed : nor is its identity there defined, further than by describing it as a lot situated on "Government street."

The other ground, and that on which the heirs of Eslava mainly rely for a recovery, in this state of conflicting inchoate paper titles, is his prior possession, under a claim and assertion of right, for more than twenty years.

The circumstance that this case has previously been before this court,ª and that a decision was then made, that the prior possession alone did not entitle the heirs of Eslava to recover against the defendant, holding under his patent certificate, is in no degree decisive of the case in its new aspect.   Then, it did not appear that the claim of Eslava had ever been produced in evidence before the commissioners; that it had ever been brought, in the opinion of the commissioners, within the protection or indulgence of either of the acts of Congress; or that he had obtained a patent certificate in virtue of his occupany, and consequent presumption of a grant, or any other claim of right.

Therefore, as the United States had an undoubted right to investigate and ascertain the state of the various claims, and to recognise or reject imperfect titles, derived under the former governments, and to prescribe the mode of establishing them, on condition of forfeiture; and as the heirs of Eslava did not then shew, as they have since done, that these requisites had been complied with—they could not claim

the benefit of the right, from possession alone, against a title confirmed pursuant to the act of congress, and recognised as legal, in the absence of any that was better, under the statute of 1812, before recited.

But now the case is different, and the least that can be said in favor of the right of the heirs of Eslava, under their certificate, is, that it balances the other set up against them, as charged by the Circuit judge; and, that, being in conflict, the certificates destroy the weight and influence of each other: consequently we must retrospect the original evidence of right in favor of each; and determine, independently of the certificates.

Then, was the possession of the premises, by the ancestor of the defendants in error, under a claim of right for about twenty-four years, anterior to the recent possession of Hallet, in the absence of any preponderating paper title, or any, whatever, in him; sufficient to warrant a recovery in ejectment, or in this action, as a substitute for it?

[a2John.22.] In the case of *Jackson* vs. *Hazen*[a] the lessor of the plaintiff had been in possession only three years, when the defendant entered, without any color of right; it was held, that such a possession would enable the plaintiff to maintain ejectment against the defendant who was to be considered a trespasser.

[b4John.202] The case of *Jackson* vs. *Harder*[b] was similar, except that the plaintiff had enjoyed a longer possession, and the defendant attempted to set up an outstanding title in a stranger. It was there held, in the opinion of the court, by Chief Justice *Kent*, not only that an intruder was denied the protection of an outstanding title in a stranger; but, also, that where upwards of twenty years of adverse posses-

sion have run against an outstanding title, it shall not be set up ;"' that, "the presumption, in that case, is, that it is no longer a *subsisting* title."[b]  It was, also held, in this case, that a claim, or title, which could not be set up by a person, while in possession, cannot be set up by another, who comes into possession under him.—That, " The necessity of guarding against fraud and collusion, between tenants and third persons, requires the observance of this rule." These principles are deemed fatal to the alleged French grant, and any original occupany by Farmer.

[a]Bul. N. P. 110; 3John 386
[b]6John.265

The effect of possession was particularly involved, in the case of *Smith* vs. *Lorillard.*[c]  In that case, also, the opinion of the court was delivered by Chief Justice *Kent*, in which many authorities were reviewed. He held, that a prior possession, short of twenty years, under claim or assertion of right, will prevail over a subsequent possession of less than twenty years, when no other evidence of title appears, on neither side;" provided, " the prior possession has not been voluntarily relinguished, without the *animus revertendi*, and the subsequent possession of the defendant was acquired by mere entry, without any lawful right.    Again, he says, "ejectment is a possessory action, and possession is always presumption of right, and stands good until other and stronger evidence destroys that presumption.    This presumption of right every possessor of land has, in the first instance, and after a continued possession of twenty years, under pretence or claim of right, the actual possession ripens into a right of possession, which will toll an entry.    But, until the possession of the tenant has become so matured, it would seem to follow, that, if the plaintiff shows a prior possession, and upon

[c] 10 John. 338

which the defendant entered, without its having been formally abandoned as *derelict*, the presumption which arose from the tenant's possession is transferred to the prior possession of the plaintiff; and so the presumption may be removed from one side to the other, *toties quoties*, until one party or the other has shewn a possession, which cannot be overreached, or puts an end to the doctrine of presumptions, founded on mere possession, by shewing a regular legal title, or a right of possession." This court has more than once recognised the same principle, on the authority of English, as well as American decisions.[a] Ejectment is admitted to be a possessory action.— Our statute of 1821, substituted this action of trespass to try titles, in lieu of it; and provides, "that the laws now in force, in relation to the action of ejectment, except so far as relates to the fictitious proceedings therein, shall be applied to the action of trespass to try titles."[b] With us, as well as in England, twenty years is a lapse of time sufficient to bar any right or title of entry. Hence, I discover no reason for doubting the application of the doctrine of possession, in this State, as well as elsewhere.

[a] 1 Stewart, 590; Id. 287

[b] Dig. 483.

What is most decisive in favor of the right of recovery by the heirs of Eslava, is, that their presumption of right, from the long continued possession, is attempted to be resisted by setting up a title, not in Hallet, the original defendant, but in the heirs of Farmer, between whom and himself no privity or connexion of title has been shown.

I am of opinion that the judgment must be affirmed.

LIPSCOMB, C. J., not sitting.